UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Frank Gautier and
Linda Gautier
        <u>Plaintiffs</u>

        v.                          Case No. 1:19-cv-00590-MSM-LDA

Gregg Bruno, alias, and
Jaclyn Casaceli, alias, and
Thomas Lavey, alias, and
Jaime Cahill, alias, and
John Does 1-5, each individually
and in their official capacity as a
Cranston Police Officer or employee,
and City of Cranston, by and through
its Treasurer David Capuano
        <u>Defendants</u>

<u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
OBJECTION TO PLAINTIFFS' MOTION IN LIMINE</u>

I.       <u>Introduction</u>

The instant matter is before the Court on plaintiffs' Motion in Limine [Doc. 24] filed by plaintiffs Frank Gautier ("Frank") and Linda Gautier ("Linda")[1] (collectively, "plaintiffs") in anticipation of trial scheduled to begin on January 10, 2023.

Defendants Greg Bruno ("Officer Bruno"), Jaclyn Casaceli ("Officer Casaceli"), Thomas Lavey ("Officer Lavey"), Jamie Cahill ("Detective Cahill") and the City of Cranston ("City") (collectively, "defendants") have filed an objection to the Motion in Limine and submit this memorandum of law in support of their collective opposition to the pre-trial motion. As the

---

[1] Plaintiffs share a common last name along with a non-party (Frankie Gautier - "Frankie") whose name will certainly be referenced in this case and therefore first names are used for the clarity of the record. No disrespect is intended by reference to first names.

1

motion touches upon a variety of different subject matters, defendants will address each of the topics of concern raised by plaintiffs.  Before doing so, defendants will first provide the court with some background to the events which led to the filing of this lawsuit to enable the trial justice to properly perform the court's gate keeping function.

    A.    <u>General Background</u>

In the fall of 2017, the Cranston Police Department ("CPD") was investigating plaintiffs' grandson, Frankie, for various drug trafficking charges including possession with intent and delivery of cocaine.  The investigation also showed that Frankie was being assisted by Corey Delekta ("Delekta").  The lead CPD investigator was Detective Cahill who was assigned to CPD's Special Investigation Unit ("SIU").[2]   As detailed in the search warrant, Detective Cahill observed Frankie make a number of controlled hand-to-hand cocaine deliveries to a confidential informant.  On each occasion, Frankie was observed leaving 60 B. Street, Cranston, Rhode Island ("60 B St.") right before making the cocaine delivery to the cooperating party.[3]

The controlled deliveries along with other information gathered by SIU led to Detective Cahill applying for and the issuance of a search warrant for the 1st floor apartment of 60 B St.[4]

---

[2] The SIU operated out of a physical location in Cranston separate and apart from CPD's main headquarters located at 5 Garfield Avenue, Cranston, Rhode Island ("Garfield Avenue").  All non-SIU members of the CPD physically reported to Garfield Avenue. SIU members physically reported to a separate location.

[3] Plaintiffs concede in their motion that they will stipulate to the existence of probable cause and, more specifically, "that [d]efendants had probable cause to request and obtain a search warrant of Plaintiffs' home". See Doc. 24 at pg. 7 (emphasis added).  Defendants will certainly accept the stipulation on the record but the plaintiffs willingness to stipulate—which could not otherwise be challenged given the undisputed facts—cannot serve to limit the presentation of the defendants' case as will be explained further below.

[4] The search warrant was issued by State District Court Magistrate Judge Joseph P. Ippolito on October 19, 2017.  The warrant also authorized a search of the "common hallway, basement, detached garage, and curtilage of the property . . . to include the person of Frankie Gautier . . ."

(the "First Search Warrant").  This warrant authorized the CPD to search for cocaine, other illegal drugs, ledgers, records, monies from sales of illegal drugs, scales, and other property and articles commonly associated with drug trafficking.

Led by Detective Cahill, members of the CPD converged on 60 B. St. on the morning of October 25, 2017 to execute the search warrant. However, in keeping with common practice, the CPD did not immediately converge upon the house.  Instead, CPD waited for the target of the search warrant—Frankie—to exit the premises.[5] From this aspect, CPD's wait and see approach worked as Frankie was observed exiting 60 B St. at approximately 9:05 am.  Frankie proceeded to enter the passenger seat of a vehicle parked in the driveway of the property.  The vehicle, operated by another person at that time, backed the vehicle out of the driveway and proceeded traveling towards Cranston Street.  After allowing the vehicle to travel some distance from the target property, the vehicle was pulled over by CPD.  The operator of the vehicle was identified as Joseph Bautista ("Bautista") with Frankie occupying the front passenger seat.  A white powdery substance suspected to be cocaine was located within the vehicle.  Bautista commented to police that it was his, not Frankie's, and that Bautista had a [drug] problem.  Both Bautista and Frankie were taken into custody and transported to CPD headquarters.

With the target in custody, CPD forged ahead with the execution of the search warrant on the residence.  There were multiple police officers assisting in the execution of the search warrant including Officer Bruno who was a K-9 officer.  Officer Bruno was not a member of the SIU nor was he involved in the criminal investigation of Frankie which led to the issuance of the First Search Warrant.  Instead, Officer Bruno was asked by SIU to assist in the event his K-9 dog

---

[5] This practice, although not required, is implemented by the CPD when available as an option for the safety of the officers, the target and other occupants of the property.

3

was needed as part of the search for controlled substances.  Officer Bruno had not seen a copy of the search warrant nor was he previously debriefed on the parameters of the warrant.

Detective Cahill and Officer Bruno entered 60 B. St. through the front door which led into a very small common hallway.  Other officers remained outside surrounding the perimeter of the property.  Detective Cahill knocked on the first floor door and announced that police were present.  There was no response.  Detective Cahill then exited the front door to ascertain if there was another outside entrance to the 1st floor unit.

Officer Bruno remained inside 60 B St. at which time plaintiff (Frank) came out of the 2nd floor door and began yelling, screaming and shouting obscenities at Officer Bruno.  Frank was shouting for Officer Bruno to get out of the house and that he had previously told Bruno not to come back without a warrant.[6]  Officer Bruno told Frank to calm down and that CPD did have a warrant.[7]  Frank did not calm down but instead escalated his tirade, quickly reentered the apartment on the second floor at which time Officer Bruno heard Frank say something to the effect of "get that sh-t out of here, the police are here".

Officer Bruno subsequently entered the second floor apartment at which time Frank not only became more belligerent but threatening and assaultive.  He came at Officer Bruno who defended himself by employing a defense tactic known as an Arm Bar Takedown to take control

---

[6] Although not part of the three (3) week criminal investigation into the drug activities of Frankie and Delekta, Officer Bruno had one occasion to meet Frank (plaintiff) at the front door of 60 B St. when CPD members were asked by the Warwick Police Department ("WPD") to arrest Frankie on an outstanding domestic violence warrant issued out of Warwick.  Frank likewise was uncooperative during this prior encounter by swearing at the police, telling the police to get a warrant and that he was not going to do their job by telling CPD where to find his grandson.  With a resistant Frank yelling at police while standing at the front door, Officer Bruno left and instructed the other two (2) officers to depart from 60 B St. without arresting Frankie.

[7] Defendants understand that plaintiffs will likely dispute certain facts provided in this "General Background".  The disputed facts will obviously need to be decided by the jury.

4

of Frank. Plaintiff was taken down to the ground but still continued to resist arrest. Officer Casaceli, who had entered the apartment in the midst of Officer Bruno taking Frank to the ground, was able to assist Office Bruno handcuff plaintiff who was then arrested for simple assault, disorderly conduct and resisting arrest.[8] Other CPD officers entered the apartment following the apprehension of Frank.

Delekta was found in a bedroom in the second floor apartment. Inside the bedroom, police observed cocaine, Adderall, baking soda, digital scale, box of sandwich bags and other sandwich bags on the floor. This was a bedroom shared by Frankie and Delekta. She was arrested by CPD and initially charged with unlawful possession of cocaine with the intent to deliver, conspiracy (with Frankie) to distribute with intent to deliver cocaine and obstruction. Delekta later pled to an amended charge of possession of a controlled substance and sentenced to a 36 months with 3 months to serve and 33 months suspended with probation.

A criminal information charging Frankie with various controlled substance offenses including possession with intent to deliver and conspiracy remain pending in the Superior Court.

    II.    Legal Argument

        A.    Defendants' Military Service

The plaintiffs have moved in limine to exclude any evidence of defendants' military service. Other than an empty argument that reference to military service will prejudice the jury, plaintiffs make no effort to develop their legal argument. For this reason alone, plaintiffs' request should be denied.

That said, defendants should not be barred from providing the jury with any officer's or

---

[8] Although there are additional facts germane to the overall case, defendants will limit the general background to the facts necessary for the court to pass upon plaintiffs' Motion in Limine.

5

other witnesses' work, educational or other biographical background merely because part of the witnesses' history involves the military. Such a blanket rule would only serve to potentially prejudice the witness and the defendants whose backgrounds may involve the military.[9]

The jurors will certainly know that the individual defendants and other witnesses are police officers. The fact that any defendant or witness served in the military prior to their law enforcement career is not a prejudicial fact that requires this court to exclude it from purview of the jurors. The court's jury instructions will highlight to the individual members of the jury that no heightened credence should be given to a witness merely because they are a police office or served in the military.[10]

Bottom up, the court will give the appropriate instruction regarding credibility of witnesses. There is no basis for striking the reference to a witness' military background and therefore plaintiffs' request should be denied.

                B.      Defendants' Awards and Commendations

No different than their argument to exclude military service, plaintiffs fail to place any context to their argument that *any* reference to awards and commendations must be excluded. Plaintiffs fail to identify which defendants or witnesses this argument applies to. They fail to identify any awards or commendations which they specifically seek to exclude. This court cannot possibly rule on plaintiffs' argument in a vacuum without *any* specific proffer from plaintiff.

---

[9] Take for example a 40 year old witness who has a twenty (20) year career in the military who is asked preliminary questions on direct examination to provide a work history. Would the witness not be allowed to tell the jury that he was in the military for twenty (20) years? If the answer to this question is in the affirmative, the witness and the party calling the witness is prejudiced as the jury may conclude that this witness was unproductive and did not work for twenty years.

[10] On the other hand, the opposite much also be included in any instruction: No witness should be disbelieved solely and simply because the witness serves in law enforcement or in the military.

6

Moreover, plaintiffs' limited argument appears to suggest a *per se* rule that commendations and awards are expressly prohibited from the jury's ears. No such blanket rule exists.

Based on the lack of record, plaintiffs' motion should be denied without prejudice. (subject to plaintiffs raising the issue if and when the moment presents itself).[11]

### C. Plaintiffs' Record of Arrests

Defense counsel has reviewed the two (2) criminal cases referenced in plaintiff's Motion in Limine [Doc. 24 at pg. 5 fn.1]. Defendants agree that the prior 2006 and 2007 criminal cases should not be referenced unless of course Frank opened the door. For example, if he testifies that he had never been arrested or criminally charged prior to the incident in question, defense counsel is entitled to impeach plaintiff on those grounds. Other than that scenario, those prior arrests are not admissible.

### D. Evidence of Investigation and Prosecution of Frankie and Delekta

On this portion of their motion, plaintiffs are more descript. They attempt to exclude essentially the CPD's entire criminal investigation into Frankie and Delekta who the police had probable cause to believe—as plaintiffs acknowledge—were involved in criminal drug possession and/or delivery of controlled substances. Delekta and Frankie were observed coming and going at critical times from 60 B St. which gave the police probable cause to believe that cocaine, other illegal drugs, ledgers, drug proceeds, scales and other evidence of drug distribution would be found at 60 B St. While the police had the wrong apartment unit, the very place where Delekta and Frankie lived—the plaintiffs' apartment—is where cocaine, baggies, a scale and controlled substance(s) were located. The investigation itself, the events leading up to

---

[11] Defense counsel represents that his opening statement will not delve into any individual defendants' or witness' commendations and awards but he certainly retains the right to reference benign matters such as number of years of service as a police officer, promotions, rank and title.

7

the execution of the search warrant (which includes the arrest of Bautista and Frankie) and the entry into 60 B St. and the subject apartment are all relevant to plaintiffs' claims against Defendants and the defenses thereto. The jury will be completely led off into a dark room without hearing the events leading up to October 25, 2017 and learning how the CPD and Frank came into contact with one another on the day in question. The jury must hear the entire story, not only bits and pieces as proposed by plaintiffs.

Plaintiffs' proposed stipulation that there was probable cause for a search warrant to issue for their home is not enough and is an attempt to mislead and confuse the jurors. Plaintiffs can try to distance themselves from Franki and Delekta. Frank can deny all he wants that he made the statement "the police are here. get rid of that sh-t". However, plaintiffs cannot get around the fact that it was their personal residence where Franki was storing and bagging his cocaine for sale. More importantly, it was their residence where the police found the cocaine and other illicit materials connected to drug dealing.

The photographs of the bedroom are relevant. The photographs show what plaintiffs observed inside their own home. If they want to deny observing the bedroom or the illegal activity being carried out and conducted in their personal residence, they can deny it and let the jury decide the question. However, plaintiffs cannot obfuscate the presentation of the case by attempting to ignore the events leading up to October 25, 2017 and entry into plaintiffs' home. The entire criminal investigation is relevant and admissible and must be admitted.[12]

---

[12] Defense counsel understands that police narratives itself are generally not admissible but the witnesses must be allowed to testify regarding the criminal investigation. The witnesses can certainly use the police narratives and other materials to refresh their recollection on events dating back now 5+ years without admitting the documents as full exhibits.

With respect to the evidence receipt showing the items that were taken from plaintiffs' home, that receipt should be admitted if for nothing else, to establish what was inside plaintiffs' home. Were plaintiffs aware of the illegal contraband and other items in their home? That and many other questions will be questions for the jury to sort out which only can be done if the jurors have all relevant evidence at their disposal.[13]

With respect to the booking photographs of the three (3) other arrestees on the day in question (Frankie, Delekta and Bautista), those are relevant to show that three (3) other persons were arrested and they were all arrested without incident. Those photographs counter the booking photos of Frank marked as exhibits 2(a) and 2(b).[14]

For all the foregoing reasons, defendants respectfully request that plaintiffs' Motion in Limine be denied (other than as set forth above).

Defendants,
Gregg Bruno, Jaclyn Casaceli,
Thomas Lavey, Jamie Cahill
and the City of Cranston
By and through their attorneys,


/s/ *Michael J. Lepizzera, Jr.*
Michael J. Lepizzera Jr., Esq. (#4995)
Lepizzera and Laprocina Counsellors at Law, Ltd.
117 Metro Center Blvd, Suite 2001
Warwick, RI 02886
Tel: (401) 739-7397
Fac: (401) 384-6960
Email:  MLepizzera@LepLap.com

---

[13] The plaintiffs' knowledge is relevant and his knowledge of the drug activity in his apartment goes to support the statement Officer Bruno will testify that Frank said: "the police are here. get that sh-t out of here".  Frank's knowledge of the criminal activity to be found in the house also supports the anticipated testimony that Frank did everything possible to keep the police out of his apartment.

[14] Defendants will consider withdrawing the booking photographs of Frankie, Delekta and Bautista if plaintiffs withdraw the booking photographs of Frank.

9

CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*/s/ Michael J. Lepizzera, Jr.*
Michael J. Lepizzera, Jr. (#4995)